In re J. F.

[Cite as In re J. F., 17 Ohio Misc. 40.]

(No. 217144—Decided November 26, 1968.)

Juvenile Court of Cuyahoga County.

*Mr. John T. Corrigan*, prosecuting attorney, *Mr. Frederick W. Frey* and *Mr. Raymond D. Metzner*, for the petitioner.
*Mr. David Sindell*, for J. F. and his parents.

WHITLATCH, J. This matter comes before the court on the motion of counsel for J. F., an adjudicated delinquent child, to vacate an entry heretofore made committing J. F. to the Ohio Youth Commission and to terminate this court's jurisdiction of J. F. J. F. became 21 years of age on March 21, 1968. He was adjudged delinquent on January 15, 1965, and committed to the Ohio Youth Commission on February 8, 1965, when he was 17 years of age. The intervening time has been expended by his counsel in unsuccessful appeals to the Court of Appeals, the Ohio Supreme Court and finally to the United States Supreme Court. Since the date of his commitment to the Ohio Youth Commission J. F. has been at liberty on the *ex parte* order of

one of the judges of the Court of Appeals. Because this case so well illustrates the multiplicity of problems and frustrations encountered by the Juvenile Court in effectuating a plan in the best interests of a child, it is deemed worthy of a relatively brief summation.

J. F. was brought before the court charged with being delinquent in that on certain specific dates during the period from October 1963, to the latter part of July 1964, he set fire to four frame garages of the homes on the street on which he lived, including the garage of his own home.

J. F. denied the charges. The hearing consumed almost four weeks of actual trial time. Sixty-two witnesses testified; many of them called by J. F.'s counsel in an effort to establish that the fires were of unknown origin or could have been started by a person or persons other than J. F. Expert witnesses on both sides testified as to whether or not the fires were of incendiary origin.

Testimony adduced at the hearing disclosed the following:

All of the fires occurred in the immediate vicinity of J. F.'s home—his own garage, the garage on the immediate southerly side of his residence, one immediately north of the house directly across the street from his residence and the other immediately south of the house across the street. J. F. was in close proximity of all of these fires when they occurred; it would have taken him no more than two or three minutes to go from his home to the scene of all the fires—perhaps less than a minute in the case of his own garage and that of his next door neighbor. The fire in his own garage occurred about 10:40 p. m.; just a matter of minutes after J. F. and his parents returned home from an outing. At the time of the other fires J. F. was at home but his parents were absent from the home.

There was no doubt of the incendiary origin of the fires. The residents of the suburban street on which J. F. lived with his parents were terrified by this series of garage fires in such close proximity to their family dwellings. In two instances the garage fires ignited the dwelling houses which were on the same lot as the garage. In another in-

stance an automobile in a garage was consumed by the fire. The total loss from the fires was about $20,000.00.

J. F.'s mother was one of the leaders of a citizens group that demanded apprehension of the arsonist. The police upon investigation considered J. F. a suspect and with the consent in writing of J. F. and his parents, J. F. underwent a polygraph examination. At the conclusion of this examination he voluntarily admitted setting the fires. The results of the polygraph examination were not admitted in evidence.

With the consent of his parents and J. F., J. F. was then interrogated by a detective in an interrogation room equipped so that J. F.'s parents, who were sitting outside the room, could observe the detective and J. F. and hear their conversation without J. F. or the detective being aware of their presence.

At the conclusion of an extensive and most thorough cross-examination by J. F.'s counsel of the detective who had questioned J. F. as to the circumstances surrounding the confession, the court concluded that the confession was entirely voluntary and J. F.'s incriminating admissions were received in evidence.

His admissions disclosed exact and detailed information of the origin of each fire which he could have possessed only by having set the fires. J. F. told the detective he had set his own family's garage on fire to avert suspicion from himself since he knew he was suspected. At the conclusion of the police interrogation, the parents thanked the police for their courteous and considerate treatment of J. F. and asked and received the permission of the police to take J. F. with them to New York City to attend the World's Fair; while enroute to New York J. F.'s mother telephoned the police and again thanked them for their considerate treatment.

J. F.'s counsel called Dr. W., a psychiatrist who had J. F. under treatment, and made an exhaustive effort to get into the record Dr. W.'s testimony to the effect that it was a medical certainty that J. F. because of his psychological and emotional makeup, could not have set the

fires. Had the court received this testimony, we also could have logically considered the report of Dr. A. (a clinical psychologist) submitted by J. F.'s counsel. Dr. A, reported that "J. F. is a very disturbed boy with a very fragile ego," that when he discusses "his interest in fires and accidents * * * he talks about (them) almost as a compulsion," and that "he hears sirens before they are apparent to anyone else."

The court rejected both the opinion of the psychiatrist and the report of the psychologist as having no probative value in the determination of the ultimate question of whether or not J. F. set the fires.

Although the quantum of proof necessary for a finding of delinquency, at time of the trial and at this writing, is a preponderance of the evidence (*In re Agler*, 15 Ohio App. 2d 240; *State* v. *Shardell*, 107 Ohio App. 338), the court in this case had evidence in support of the petition that was beyond a reasonable doubt. Accordingly J. F. was adjudged delinquent.

The court then came to the dispositional phase of the proceeding, very much aware of his responsibility to effect a plan for this young man that would bring him to healthy adulthood and constructive citizenship and at the same time would protect the community from a repetition of his acts.

It was the court's considered opinion that it was essential to J. F.'s welfare that he be placed outside his family home. There was abundant evidence in support of this plan. Unlike in the adjudicatory hearing, in the dispositional hearing the clinical reports are not only admissible but are frequently indispensable. The psychological report submitted in evidence by the defense and alluded to above contained the following:

"J. F.'s Rorschach was very poor. * * * there was evidence that he perceives women (his mother) as castrating and devouring and contact with them as extremely dangerous." "He described his mother as always yelling but at the same time very physically affectionate."

The clinical psychologist who examined J. F. at the request of the court reported:

"J. F.'s picture of himself suggests low self-esteem in which he experiences himself as 'crushed.' This type of experience of himself appears related to the father figure, the patient tending to reject the father figure and to project sadism onto him. The father is seen as the 'crushing' influence in the patient's life."

J. F. told the police that he hated both his father and his mother.

We perceived J. F. to be the victim of a rather familiar syndrome, too common in America today. This syndrome is characterized by parents who are completely consumed by the idea that if they can acquire wealth, material things and social status, all the other important matters in life will take care of themselves. Another boy recently before the court on the charge of burglary very aptly described his wealthy father as having "scratched his way up to his present level." J. F.'s parents, particularly the mother, impressed the court as having indeed "scratched their way up" a sheer wall and as having in the process developed full blown neuroses.

J. F. obviously needed placement in a warm secure environment where his emotional problems would receive the required attention. Most residential treatment centers are quite reluctant to accept placement of a "fire setter." However, our probation department finally succeeded in making arrangements for J. F.'s placement in a group home operated by the nationally famous Hawthorne Cedar Knolls agency in New York City. Here J. F. would be free of the unbearable pressures of his home and with the benefit of counselling from skilled therapists and the relationships he would form J. F. could become involved with people in an affectional way so indispensable to the development of the outer controls he so desperately needed. In this placement J. F. would have been able to attend college which he normally would have been entering at that time or he could have found employment. This was a rather expensive placement but the parents who were well to do dress manufacturers could easily have borne the expense. Our suggestion to counsel that we meet with him and

J. F.'s psychiatrist to work out the details for this plan met with a flat refusal from both counsel and the psychiatrist, counsel informing us that it was his intention to appeal the decision. Since making this disposition without the parents' cooperation and willingness to pay the expense would have been a vain judgment, and there being no other placement facility available, the court committed J. F. to the Ohio Youth Commission and remanded him to the detention home. The court was hopeful that the reality of this commitment would persuade the parents to accept the very appropriate plan that the court had originally evolved for J. F.'s care and treatment. However, this was not to be since one of the judges of the Court of Appeals, without hearing, ordered J. F.'s release from the detention home within an hour after he had been placed there. Thereupon J. F.'s counsel prosecuted his appeal with the result that our judgment was affirmed by the Court of Appeals. An appeal and a motion to certify was denied by the Ohio Supreme Court. Counsel for J. F. encouraged by the *Gault* decision (*In re Gault*, 387 U. S. 1, 87 S. Ct. 1428), appealed to the United States Supreme Court and finally a year later, in July of 1968, six of the justices of the Supreme Court dismissed the appeal and denied the petition for a writ of certiorari. Mr. Justice Fortas and Mr. Justice Douglas were of the opinion "that certiorari should be granted, the judgment vacated and the case remanded for further consideration in light of *In re Gault, supra.* Mr. Justice Black dissented. Even though Mr. Justice Fortas and Mr. Justice Douglas represent a distinct minority their suggestion that this case be reexamined "in light of *Gault*" is worthy of comment.

We see no similarity between *Gault* and the case at bar. In the *Gault case* the errors were lack of notice, lack of counsel, and self-incrimination. In J. F.'s case although it arose three years before *Gault*, he had timely notice, with detailed particulars of the alleged unlawful acts, along with notice in writing of his right to counsel, and other legal rights and privileges. J. F. had a highly skilled lawyer and of course did not testify against himself.

The only remote connection with this case and *Gault* was that J. F. had not been given the *Miranda* warning (*Miranda* v. *Arizona* [1966], 384 U. S. 436), as to right to counsel at the police interrogation. However, J. F.'s case arose two years before the *Miranda* decision which by its holding precluded retroactivity. As Mr. Justice White points out in *Gault*, there was a seeming attempt in Mr. Justice Fortas' *Gault* opinion to apply *Miranda* retroactively to proceedings in the Juvenile Court. Why this should be we will never understand but fortunately six justices of the United States Supreme Court, in this instance, apparently deemed it unreasonable to apply *Miranda* retroactively to Juvenile Court proceedings.

We now come to the consideration of counsel's motion to vacate the commitment to the Ohio Youth Commission and to terminate the court's jurisdiction. J. F. is now almost twenty-two years of age. The Ohio Youth Commission would not be able to accept him if we were disposed to send him there. Section 5139.10, Revised Code, provides as follows:

Unless the child has already received a final discharge, the control by the Youth Commission of a child committed as a delinquent shall cease when the child reaches the age of 21 years.

The petitioner's position here might be likened to the impossible situation of a litigant obtaining a judgment and then losing it by the running of a statute of limitations during his opponent's unsuccessful appeal.

Section 2151.38, Revised Code, provides in substance that unless otherwise terminated, commitments by the court continue only until the child is 21 years of age and, therefore, this court's jurisdiction is now terminated by operation of law. J. F.'s counsel has already obtained the object of his motion. Further, since we no longer have jurisdiction, we have no authority to make any order in this case, even one which would vacate the previous order of court. The motion to vacate the commitment to the Ohio Youth Commission and to terminate the jurisdiction of this court is therefore dismissed for lack of jurisdiction.

Although the court is now powerless to carry out its judgment or make any other disposition of J. F.'s case, the record of the delinquency adjudication and the commitment to the Ohio Youth Commission will remain in this court so that there can never be a question that the court waivered in its belief to a moral certainty that J. F. set the fires that terrorized his neighborhood.

This case is a tragic example of the law's delay. Fortunately J. F.'s adjudication served as sufficient control to prevent further fire setting. It well may be that J. F. has won a Pyrrhic victory. We have no knowledge of his present situation; whatever it may be we are confident that if the court's plan for placement at Hawthorne Cedar Knolls had been effectuated, J. F. would have had a happier, healthier life.

Perhaps this case will serve the useful purpose of pointing up the need for legislation or a rule of court to provide that appeals from judgments of the Juvenile Court shall have a priority in the Courts of Appeals and the Supreme Court and that the judgment of the Juvenile Court shall not be disturbed pending appeal without a substitute plan for the care of the child which has the approval of the Juvenile Court Judge.