**STATE of Texas, Petitioner,**

v.

**George Rivera SANTANA, Respondent.**

**No. B-1132.**

Supreme Court of Texas.

July 23, 1969.

Rehearing Denied Oct. 1, 1969.

Thomas J. Purdom, County Atty., Jack Layne, Asst. County Atty., Lubbock, Crawford C. Martin, Atty. Gen., Monroe Clayton, Asst. Atty. Gen., Austin, for petitioner.

Brock, Wright, Waters & Galey, William T. Kirk, Jr., Lubbock, for respondent.

GREENHILL, Justice.

The problem in this juvenile proceeding is the quantum of proof required. The jury found, from a *preponderance of the evidence,* that George Santana, age 14 at the time of the trial, committed rape upon Frone Mintz and that he was a delinquent child. He was committed to the Texas Youth Council. The contention is that the use of "the preponderance of the evidence" is no longer permissible; and that under the *Gault* decision of the Supreme Court of the United States, the findings must be beyond a reasonable doubt as in criminal cases. In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). The Court of Civil Appeals agreed with the contention. It reversed in the light of *Gault.* 431 S.W.2d 558. We granted a writ of error to review that holding. A second point, not reached by the Court of Civil Appeals, is whether the State could amend its petition before trial. We must deal with that contention also.

Counsel for Santana did not object to the wording of the jury issues on the ground that they called for answers based upon a "preponderance of the evidence." Nor did counsel ask for or submit requested issues for the jury based upon the quantum of proof "beyond a reasonable doubt." The point was raised for the first time on motion for new trial as fundamental error. In the ordinary civil case, the alleged error in the charge to the jury would be considered as waived. But in view of the constitutional importance of this case to the public generally, and in view of the fact that juvenile proceedings are not designed to be conducted as ordinary adversary proceedings, the point raises a question of fundamental error, and it will be so treated. Ramsey v. Dunlop, 146 Tex. 196, 205 S.W.2d 979 (1947); McCauley v. Consolidated Underwriters, 157 Tex. 475, 304 S.W.2d 265 (1957).

The opinion in *Gault* made a wide and critical analysis of juvenile proceedings. The tone of the opinion is that minors as well as adults are entitled to basic constitutional protection. It dealt with six subjects; and as to the first four, it was held that the minor was entitled to constitutional protection: notice of charges; right to counsel; right to confrontation of witnesses and of cross-examination; and privilege against self-incrimination. It reserved the questions of a right to a transcript of the proceedings, and right to an appellate review. The only one of these elements raised here deals with adequate notice of the charges. This relates to the amendment of the State's petition before trial. Moreover, Santana had a trial by jury, a right still withheld in some states in juvenile cases. In *Gault,* the minor was committed for a maximum of six years; while for the same offense (obscene phone calls) the punishment for an adult was a fine of $50 and two months in jail. The maximum here for Santana is seven years of detention. For an adult the maximum punishment for the same offense (rape) is death or life imprisonment.

The minor involved in *Gault* was not tried under the "beyond a reasonable doubt"

rule. The Arizona law called for findings by "clear and convincing evidence." When the United States Supreme Court remanded the cause for the equivalent of a new trial, it expressly did not pass upon whether "beyond a reasonable doubt" was required by the Constitution of the United States. It said, "We shall not consider other issues which were passed upon by the Supreme Court of Arizona. We emphasize that we indicate no opinion as to whether the decision of that court with respect to such other issues [including "beyond a reasonable doubt"] does or does not conflict with requirements of the Federal Constitution." The Supreme Court also declined to pass upon the question in In re Whittington, 391 U.S. 341, 88 S.Ct. 1507, 20 L.Ed.2d 625 (1968).

It is strongly urged here and in some contemporaneous writings that the opinion in *Gault* means that a juvenile proceeding which may end in depriving a person of his liberty is, in reality, a criminal trial; and that to satisfy the due process and equal protection clauses, juvenile proceedings must be accompanied by all of the same measures and protections afforded in criminal trials. We do not so read *Gault*. The *Gault* opinion goes out of its way to say it does *not* mean to so hold. It quotes from Kent v. United States, 383 U.S. 541, 562, 86 S.Ct. 1045, 1057, 16 L.Ed.2d 84 (1966).

"We do not mean * * * to indicate that the [juvenile] hearing to be held must conform with all of the requirements of a criminal trial or even of the usual administrative hearing; but we do hold that the hearing must measure up to the essentials of due process and fair treatment."

The *Gault* opinion then states, "We reiterate this view. * * *" The Court sets out many of the desirable features of juvenile hearings such as the processing and treatment of juveniles separately from adults and the special juvenile court procedures which avoid classifying the juvenile as a "criminal." The conclusion stated in *Gault* is that "the features of the juvenile system which its proponents have asserted are of unique benefit will not be impaired by constitutional domestication"; and "There is no reason why the application of due process requirements should interfere with such provisions."

The facts in *Gault* were extreme, and the material reviewed by the Supreme Court of the United States indicated to it that much of the good intended by juvenile proceedings was being poorly carried out at least in some areas including Arizona.

The Court reviewed the history of juvenile treatment and recalled that as the juvenile acts were designed, it was *not* the goal of the State to determine whether a child was guilty or innocent, but to determine what is he, how has he become what he is, and what had best be done in his interest and in the interest of the State to save him from a downward career. The child, essentially good, was to be made to feel that he was the object of the State's care and solicitude, not that he was under arrest or on trial. The rigidities, technicalities, and harshness of the criminal law were altogether inapplicable. The idea of crime and punishment was to be abandoned. The child was to be treated and rehabilitated. Moreover, no permanent public record was made of his hearing or trial so that the child would not be branded as a criminal simply because he was subject to the help and discipline of the state.

Under the Texas act, no adjudication of the status of any child may operate to impose any civil disabilities ordinarily imposed by conviction, "nor shall any child be deemed a criminal * * *, nor shall any child be charged with or convicted of a crime in any court. The disposition of a child or any evidence given in the court shall not be admissible as evidence against the child in any case * * * other than another Juvenile Court, nor shall such disposition or evidence operate to disqualify a child in any future civil service examina-

tion, appointment, or application." Art. 2338–1 § 13(3).

The *Gault* opinion recognized, or at least reserved judgment on, the policy of the juvenile court system. It declined to announce that they were either criminal or civil courts, rather recognizing that they were *sui generis*. It did make it plain that the system was being badly abused in some areas so that many children, not properly treated as juveniles, were not given the protection of adults, and got "the worst of both worlds." And, on many occasions, instead of getting the kindly father approach from the judge, a child was often whisked away to the equivalent of a prison in what amounted to Star Chamber proceedings. "His world becomes 'a building of whitewashed walls, regimented routine and institutional laws * * *' Instead of mother and father * * * his world is peopled by guards, custodians, state employees, and 'delinquents' confined with him for anything from waywardness to rape and homicide." 387 U.S. at 27, 87 S.Ct. at 1443.

At the darkest point in this bleak picture masterfully painted by Mr. Justice Fortas is the thundering statement that "Under our Constitution, the condition of being a boy does not justify a kangaroo court."

To correct the kangaroo court approach, the *Gault* opinion announced basic constitutional guarantees for juvenile proceedings, whether they be civil, criminal, or *sui generis*: adequate notice, right to counsel, confrontation and cross-examination of witnesses, and the privilege against self-incrimination.

We ascribe to the *Gault* court not a desire to abolish the attempt of the state to treat and rehabilitate the child through juvenile proceedings, but a laudable mandate that in juvenile proceedings, the rights of the child be preserved; that the proceedings be conducted with basic fairness. Instead of the *worst* of both worlds under the abused juvenile proceedings, the *Gault* court, it is thought, desired to preserve the

*best* of both worlds for the minor; i. e., the individual, particularized treatment of the disturbed, rebellious or wayward minor, while at the same time, insuring that the hearings be conducted with dignity and fairness and with the essentials of due process being observed.

We accept this view. This Court originally upheld the validity of the Texas Juvenile Act upon this basis in Dendy v. Wilson, 142 Tex. 460, 179 S.W.2d 269, 151 A.L.R. 1217 (1944). And while recognizing the benefits of the separate treatment of juveniles, this Court there held that the rights of the minors were there violated because they were compelled to give testimony against themselves. Similarly in Steed v. State, 143 Tex. 82, 183 S. W.2d 458 (1944), while holding that the rules of civil, rather than criminal, procedure would be applicable to juvenile proceedings, we again reversed the particular proceedings because the charges filed against the juvenile were not definite enough to afford fair notice to the minor and his parents. And while we must accept as true much of the dismal picture painted in *Gault* as to the abuses of the juvenile system, we are not prepared to condemn out of hand the Texas Youth Council, the juvenile judges, and other trained people working in this field. The policy of the juvenile laws has been fixed by the Texas Legislature; and we conceive it to be our duty to uphold the spirit of that law while at the same time insuring to minors the basically fair proceedings required by *Gault* and the constitutions of Texas and of the United States.

So it boils down to this: are juvenile proceedings hereafter to be true adversary proceedings like the ordinary criminal trial? Must the juvenile be "convicted" upon a finding of guilt beyond a reasonable doubt? Is the quantum of proof "beyond a reasonable doubt" so essential that its absence, in a juvenile case involving loss or curtailment of liberty, is a denial of constitutional rights? Or may the State be able to assist youth in these *sui*

*generis* proceedings where the finder of fact, the judge or jury, is convinced by a preponderance of the evidence that acts have been committed, that the child is a delinquent, and that he needs the help of the State?

The problem now before us has been before the highest courts of other states, and the United States Supreme Court has noted jurisdiction in one of the cases. The courts of our sister states are not uniform; and in most instances, there is a dissent among the justices.

The Supreme Court of Illinois in In re Urbasek, 38 Ill.2d 535, 232 N.E.2d 716 (1968), absorbed the dark picture of *Gault*, equated juvenile trials to adversary criminal trials, and held that it would be a denial of due process and equal protection to afford less safeguards to minors than to adults who were on trial for crimes. It recognized that it was adopting "what has heretofore been the minority view point as to the quantum of evidence required in delinquency hearings," but it was persuaded by the implications of *Gault*. The holding was that the proof must be "beyond a reasonable doubt."

Similarly the U. S. Court of Appeals for the 4th Circuit in United States v. Costanzo, 395 F.2d 441 (1968) stated the question and answered it as follows:

"Our precise question then is whether for purposes of the required quantum of evidence, no less than for notice, counsel, cross-examination, and the privilege against self-incrimination, a federal juvenile proceeding which may lead to institutional commitment must be regarded as 'criminal.' We hold that it must be so regarded. No verbal manipulation or use of a benign label can convert a four-year commitment following conviction into a civil proceeding. See Gault, supra at 50, 87 S.Ct. 1428. The Government's burden in a juvenile case, therefore, is to prove all elements of the offense 'beyond a reasonable doubt,' just as in a prosecution against an adult. We see a com-

pelling similarity between the enumerated safeguards due a juvenile in as full measure as an adult and the requirement of proof beyond a reasonable doubt. In practical importance to a person charged with crime the insistence upon a high degree of proof ranks as high as any other protection; and if young and old are entitled to equal treatment in the one respect, we can think of no reason for tolerating an inequality in the other." 395 F.2d at 444 (1968).

It is interesting that the Court of Appeals of New York observed that "the question [of "beyond a reasonable doubt"] was not decisive in United States v. Costanzo, 4 Cir. (395 F.2d 441), where the judgment of adjudication was affirmed, and the Trial Judge had applied what the court regarded as a proper standard of proof." In the Matter of Samuel W., 24 N.Y.2d 196, 299 N.Y.S.2d 414, 247 N.E.2d 253 (Opinion of March 6, 1969).

Holding to the contrary are the highest courts of New York, California and Oregon and the Court of Appeals for the District of Columbia. In In re Wylie (D.C. App.1966), 231 A.2d 81, that court, after reviewing *Gault*, concluded that, "We adhere to our ruling in In re Bigesby [D.C. App., 202 A.2d 785] * * * that 'the strictly criminal law concept of guilt beyond a reasonable doubt' is unnecessary and im proper in a Juvenile Court proceeding." That same court has very recently reaffirmed the holding of Wylie in In re Ellis, D.C.App., 253 A.2d 789 (May 1969). The court there held:

"While we have not failed to follow the ruling of Gault in those cases where it clearly applies, Gault did not decide the question of the quantum of proof required in juvenile cases. We are therefore not persuaded at this time that we should apply the philosophy of Gault in order to predict what the Supreme Court might decide if faced with the same question. We are reluctant to condemn or abandon a longstanding and useful prac-

tice unless the unconstitutionality of that practice is plain and manifest. [citing case]

"Concededly there are points of similarity between a juvenile proceeding and a criminal trial. Nonetheless, hearings held before the Juvenile Court remain civil in nature and differ significantly from their criminal counterpart. By statute, the records of juvenile cases are not open to public inspection. Hearings are also closed to the public. Furthermore, a child adjudged delinquent is neither deemed nor treated as a criminal. No civil disabilities are imposed upon him and he is not disqualified from civil service. The purpose and rationale behind such safeguards and, indeed, the very procedure governing treatment of such juveniles is the care, needs and protection of the minor and his rehabilitation and restoration to useful citizenship. [citing authority] A flexible approach to juvenile proceedings is the best manner in which to achieve these ends. The safeguards which surround him do not inherently derive from the Constitution but from the social welfare philosophy which forms the historical background of the Juvenile Court Act.

"Subsequent to the Gault decision, we had occasion to deal with the same question presented on this appeal. In re Wylie, D.C.App., 231 A.2d 81, 84 (1967). There we noted that, although Gault had alluded to but not passed upon the standard of proof required in Juvenile Court cases, we determined to adhere to our prior ruling in In re Bigesby, D.C.App., 202 A.2d 785, 786 (1964), that 'the strictly criminal law concept of guilt beyond a reasonable doubt' was unnecessary and improper in a Juvenile Court proceeding. We find no justification for abandoning or reversing that ruling under the facts and circumstances of this case. As was stated in Creek v. Stone, 126 U.S.App. D.C. 329, 379 F.2d 106 (1967), the clear congressional purpose was to establish a professionally staffed, specialized court, equipped with broad powers to implement the rehabilitative purposes of the Juvenile Court Act."

In May of this year, the Oregon Supreme Court made a similar holding in State v. Arenas, 453 P.2d 915. It observed that individual writers, agencies and commissions had differed on the advisability of such a quantum of proof as a requirement. It concluded:

"If the constitution requires that a juvenile cannot come within the jurisdiction of the court unless criminal conduct is proved beyond a reasonable doubt, the great juvenile experiment is over.

"If such a burden of proof is constitutionally required, it logically follows that subsections (b), (c) and (f) of the statute are in violation of the constitution. Such subsections do not describe conduct which is necessarily criminal. These subsections concern delinquency, not child dependency. In the event the court finds such conduct has occurred, the legislature has empowered the juvenile court to deprive the juvenile of his freedom if that is believed desirable. ORS 419.509.

"If the Constitution is held to prohibit the juvenile court from depriving a juvenile of his freedom unless it is proved beyond a reasonable doubt that he committed a criminal act, the Constitution would have to be interpreted to prohibit depriving a juvenile of his freedom when he was found to have engaged in conduct not amounting to a crime.

"The logical end of such reasoning would be the conclusion that regardless of how apparent the need for intervention for the good of the child, the community, the judiciary and every other institution or agency would be powerless to act until and unless criminal conduct could be proved beyond a reasonable doubt.

"We are of the opinion that such a result is not a requirement which logically extends from Gault."

The highest court of New York painstakingly reviewed the history of the problem in the light of *Gault* in In the Matter of Samuel W., 24 N.Y.2d 196, 299 N.Y.S.2d 414, 247 N.E.2d 253 (March 6, 1969). The opinion recognizes a distinct need for a separate type of hearing or trial for minors, and that "[N]othing could be farther removed in temper and purpose than this [juvenile proceeding] from the criminal court for adults." It observed that the juvenile court system "has had the singular misfortune of being impaled on the sharp points of a few hard constitutional cases" such as *Gault* and Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966). It is observed that hard cases were easily dramatized, but that they "were not typical of the vast mass of juvenile proceedings in the United States."

On the particular point as to the constitutionality of the New York Family Court Act which prescribed "a preponderance of the evidence" standard, the Court held:

"It is not easy to define for the purposes of practical application the tenuous difference between 'beyond a reasonable doubt' as a quantitative or qualitative test of proof, and 'by a fair preponderance of the evidence'. It is enough to say that for a very long time one has been used in the criminal law and the other in civil law, and that the profession accepts the view that beyond a reasonable doubt is a 'higher' standard.

"But the standard is in the present case expressly stated by statute; and, indeed, by a statute which goes very far in providing due process safeguards for children in delinquency proceedings in Family Court. The delinquency status is not made a crime; and the proceedings are not criminal. There is, hence, no deprivation of due process in the statutory provision; and, since the proceeding is quite different from a criminal prosecution, it seems reasonable to think there is no substantial equal protection question in the case.

"The decision in *Gault*, in which there was almost a total absence of due process, is not necessarily to be read as an interdiction of this standard of proof required by the New York statute. It is not an absence of procedural due process that a noncriminal status determination have a different measure of proof than that required for conviction of crime * * *."

The California Supreme Court squarely confronted the problem in In re Dennis M., 75 Cal.Rptr. 1, 450 P.2d 296 (Feb.1969). It held, with one judge [Peters] dissenting, that *Gault* did not require "beyond a reasonable doubt." The opinion states:

"We meet at the outset a contention advanced by appellant at oral argument: i. e., that the United States Supreme Court decision in In re Gault * * * compels the state to establish the facts supporting a charge of juvenile delinquency by the criminal standard of proof 'beyond a reasonable doubt.' We do not so read *Gault*. It is true, of course, that the decision inaugurated a sweeping constitutional reform of the rights of juveniles in this country. It drew from the teaching of earlier cases the fundamental proposition that 'neither the Fourteenth Amendment nor the Bill of Rights is for adults alone' * * *, and laid down specific guidelines for implementing those guarantees in juvenile proceedings. Yet in so doing the court took repeated pains to limit its holding by warning that 'We do not in this opinion consider the impact of these constitutional provisions upon the totality of the relationship of the juvenile and the state. We do not even consider the entire process relating to juvenile "delinquents."' * * * First, the decision was intended to affect only the adjudicatory state of juvenile proceedings, and then only when the outcome may be commitment to a state institution. * * *

Secondly, the court made it clear that even if the foregoing conditions are met, the Constitution does not require that the full panoply of rights accorded to an adult accused of crime be erected in the juvenile court. * * * Rather, the opinion * * * adopts for juvenile court adjudications of delinquency the holding of Kent v. United States * * *, that 'the hearing must measure up to the essentials of due process and fair treatment.' Those essentials, as the remainder of the opinion spells out, are (1) adequate notice of the charges, (2) assistance of counsel, (3) opportunity for confrontation and cross-examination, and (4) the privilege against self-incrimination * * *.

"* * * *

"We infer that at least for the present the Supreme Court has left this matter to the states and the lower federal courts * * *.

"* * * *

"* * * * We do not deny that *Gault* casts doubt on the traditional *parens patriae* theory, and exposes many defects in its practice; but we also take the high court at its word when it reiterates that under the Constitution the juvenile court hearing need not 'conform with all of the requirements of a criminal trial or even of the usual administrative hearing' * * *. Indeed, the opinion is replete with language admonishing that the new rules there laid down should not be taken to spell the end of the juvenile court process per se, and that many of its unique attributes can and should be preserved * * *.

"* * * *

"Although the consequences of adopting the reasonable doubt standard in juvenile court would perhaps be less drastic than adopting a jury system, to do so would nevertheless introduce a strong tone of criminality into the proceedings. The high degree of certainty required by the reasonable doubt stand-

ard is appropriate in adult criminal prosecutions, where a major goal is corrective confinement of the defendant for the protection of society. But even after *Gault*, as we have seen, juvenile proceedings retain a *sui generis* character: although certain basic rules of due process must be observed, the proceedings are nevertheless conducted for the protection and benefit of the youth in question. In such circumstances, factors other than 'moral certainty of guilt' come into play: e. g., the advantages of maintaining a non-criminal atmosphere throughout the hearing, and the need for speedy and individualized rehabilitative services. Indeed, the youth's alleged crime may often be only the latest or most overt symptom of an underlying behavioral or personality disorder which could equally well warrant a declaration of wardship pursuant to other provisions of the code. Thus a determination whether or not the person committed the particular misdeed charged—although the very heart of an adult criminal prosecution—may not in fact be critical to the proper disposition of many juvenile cases. On the contrary, in the latter the best interest of the youth may well be served by a prompt factual decision at a level short of 'moral certainty.' "

In DeBacker v. Brainard, 183 Neb. 461, 161 N.W.2d 508 (1968), the question discussed at length and with vigor was whether, under *Gault*, there is a constitutional requirement of a trial by jury, a problem not relevant here since Santana had a jury. The *DeBacker* opinion in its final paragraph, however, also says that four [of the seven] judges were of the opinion that a commitment in a juvenile proceeding must be proved, as in criminal cases, beyond a reasonable doubt; and that the Nebraska statute providing for "a preponderance of the evidence" was unconstitutional. Three of the seven judges thought the "preponderance of the evidence" statute was constitutional. However, a provision of the Nebraska Constitution says that no legislative act shall

be declared unconstitutional "except by the concurrence of five judges." So the holding of *DeBacker* is that the "preponderance of the evidence" juvenile statute is constitutional, even though the judges stood 4 to 3 to the contrary.

On February 24, 1968, the United States Supreme Court noted probable jurisdiction in the *DeBacker* case, and the case was placed on the summary calendar. 393 U.S. 1076, 89 S.Ct. 856, 21 L.Ed.2d 770. While a main problem in *DeBacker* is right to a trial by jury, the Supreme Court will have the opportunity also to pass upon the other point, "beyond a reasonable doubt."

■ We recognize able arguments and writings on both sides of this question. We have concluded that *Gault* does not require that the juvenile trial be adversary and criminal in nature, and that the "beyond a reasonable doubt" test is not required. We are therefore persuaded to follow the reasoning of the opinions of the Court of Appeals of the District of Columbia, and the highest courts of New York, California and Oregon.

■ The other point is that the State could not amend its petition before trial. The State first filed its petition on December 13, 1966, alleging that Santana had committed an assault with intent to rape. Santana pleaded a denial to the charges and alibi; i. e., he was at home with his family when the alleged event took place. On February 2, 1967, the day of the trial, the State amended its petition to change its allegation from assault to rape to the charge of rape.

Santana objected in writing to the amendment. The trial judge qualified the written objection as follows:

"The above and foregoing objections to State's Trial Amendment, having been duly and timely presented to the Court before any pleadings were read to the jury, and having been considered by the Court, the said objections as above stated are hereby qualified by the Court as follows:

"Prior to the commencement of the hearing on February 2, 1967, and before the case had been called, the State filed said Trial Amendment now objected to, and the Court informed the child's counsel in open Court, that the Court would consider any objection, but that if counsel for the child were surprised and/or had not had time to prepare for the child's case, that the Court would continue this case and set it down for trial at a later time before a jury, and the child's counsel did decline to ask for a continuance of the trial of this case, and it proceeded to trial." [Tr. 10–11]

The point is this: in criminal cases, the State may not amend the substance of its charges. Article 28.10, Vernon's Ann. Texas Code of Criminal Procedure. In civil cases, pleadings may be amended "at such time as not to operate as a surprise to the opposite party"; provided that if the amendment is tendered within seven days of the trial, leave to amend may be granted by the trial court "[unless] such amendment will operate as a surprise to the opposite party." Rule 63, Texas Rules of Civil Procedure. As we understand the record in this case the trial court offered Santana a postponement of the trial if he was surprised or needed additional time to prepare his case, and counsel did not request a postponement. He apparently chose to stand on the rule of criminal procedure that no amendment was permissible.

■ Holding as we have that juvenile proceedings are not strictly adversary criminal proceedings but are, under *Gault, sui generis* and to be tried under our statutes as civil cases, it was not error for the court to grant the State the leave to amend. And, under *Gault*, it is our opinion that the granting of the leave to amend, while at the same time offering Santana an opportunity to postpone the trial to some later date if he so desired, did not deprive the minor of an essentially fair trial so as to offend the due process clause.

The judgment of the Court of Civil Appeals is reversed, and the judgment of the trial court is affirmed.

POPE, SMITH and STEAKLEY, JJ., dissent.

POPE, Justice (dissenting).

The question presented is whether George Rivera Santana, a fourteen year old boy, was entitled to be tried for the offense of rape, at the adjudicatory stage of a delinquency proceeding, under the quantum of proof beyond a reasonable doubt, instead of by the preponderance of the evidence. The court of civil appeals reversed the trial court's judgment because Santana was not tried by the reasonable doubt measure of proof. 431 S.W.2d 558. I would affirm the judgment of the court of civil appeals.

A delinquent child is, among other statutory definitions, one who, within age limits, "violates any penal law of this state of the grade of felony." Sec. 3, Art. 2338–1, Vern.Ann.Tex.Civ.Stats. The definition of a felony is found in the Texas Penal Code and is one which "may—not must—be punishable by death or by confinement in the penitentiary * * *." Art. 47, Vern.Ann.Tex.Penal Code. The issue submitted to the jury in the adjudication of Santana asked, "Do you find from a preponderance of the evidence that George Rivera Santana raped Frone Mintz at the time and on the occasion in question?" The court instructed the jury that " 'rape,' as used in this charge is a violation of the penal law of this State of the grade of a felony. You are further charged that 'rape' is the carnal knowledge of a woman without her consent, obtained by force or threats." Then followed instructions about "force," "threats," "consent," and "alibi." Following the trial, Santana was committed to the Texas Youth Council, thence to confinement and treatment. This is the nature of this "civil" trial.

## The Adjudicatory Stage

A correct decision requires us to focus upon the stage of the juvenile proceeding with which we are dealing. Settled practices recognize three stages in juvenile proceedings, (1) the intake, (2) the adjudicatory hearing, and (3) the disposition. The first stage is the pre-judicial or intake stage, at which time juvenile authorities are confronted with and handle, for varying periods of time, cases of all kinds—truancy, insolence, smoking, runaways, morals, misdemeanors, felonies. The second stage is that of adjudication, the purpose of which is to determine judicially the truth of the allegations in a petition in delinquency. The third stage, disposition, is the process in reaching a considered judgment of the best method for handling the child adjudged a delinquent. See, In the Matter of J. F., 17 Ohio Misc. 40, 242 N.E.2d 604 (1968).

To accommodate the aims of juvenile philosophy with realities, it is important that one recognize the significant difference in juvenile procedures between the intake stage up to the adjudicatory hearing and the procedures required at the adjudicatory or judicial stage. The U.S. Supreme Court, in In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) carefully limited its decision to the adjudicatory stage, saying:

"We do not even consider the entire process relating to juvenile 'delinquents.' For example, we are not here concerned with the procedures or constitutional rights applicable to the pre-judicial stages of the juvenile process, nor do we direct our attention to the post-adjudicative or dispositional process * * * We consider only the problems presented to us by this case. These relate to the proceedings by which a determination is made as to whether a juvenile is a 'delinquent' as a result of alleged misconduct on his part, with the consequence that he may be committed to a state institution. As to these proceedings, there appears to be little current dissent from the proposition

that the Due Process Clause has a role to play." 387 U.S. at 13, 87 S.Ct. at 1436.

The court also carefully distinguished non-criminal misconduct and conduct, which, if done by an adult, would be criminal. It made a third distinction, that of a disposition by commitment to an institution and a disposition other than a deprivation of liberty:

"We conclude that the Due Process Clause of the Fourteenth Amendment requires that in respect of proceedings to determine delinquency which may result in commitment to an institution in which the juvenile's freedom is curtailed, the child and his parents must be notified of the child's right to be represented by counsel retained by them, * * *." 387 U.S. at 41, 87 S.Ct. at 1451.

By this process the court looked at the judicial stage of the proceedings and the sanctions imposed rather than the State's good motives. Cadena, Due Process and the Juvenile Offender, 1 St. Mary's Law Review, 23, 28.

Santana is located at the same stage as was Gault, at the adjudicatory stage, with a felony charged, which resulted in the loss of liberty by commitment to an institution. We are not, therefore, concerned with any limitations upon care, counseling, treatment, rehabilitation, or other beneficences which he might have received and during some period of the first or third stages. Our concern is not with juvenile philosophy generally. Our concern is whether Santana has, in fact, been judicially found to be a delinquent according to due process. He declares he is innocent of the charge of delinquency; and upon principles of justice, fairness, and equal treatment that others receive when charged with rape, that he neither needs nor deserves the State's benevolence.

To hold that an act of the Legislature settles this case because it says that juvenile misconduct is a civil or a non-criminal proceeding is too easy an answer. Gault faced this issue squarely, and held that labels one way or the other were inconclusive. It did not jettison the juvenile philosophy of treatment and rehabilitation. It recognized that there is room for the benefits of juvenile procedures which classify as non-criminal a juvenile who is adjudged delinquent. The court expressly emphasized that a delinquency adjudication did not operate as a civil disability or disqualify him for civil service appointment. Following those statements, the court said, *"There is no reason why the application of due process requirements should interfere with such provisions."* (Emphasis added).

### General Acceptance of Gault

Gault has had a great impact upon all professionals interested in juvenile behavior. Juvenile courts have begun to take their correct posture as courts, and rights of juveniles have been brought back into the mainstream of fairness under our received principles of due process. The decision in Gault has met with general approval, except for the consensus that it should have come sooner. In proper perspective, " * * * courts do not solve problems; they resolve issues. As long as it remains a court, the juvenile court must be limited to this role." Tenney, *The Utopian World of Juvenile Courts,* Vol. 383, The Annals of the American Academy of Political and Social Science. Paul Tappan was among the first who questioned irregular and loose practices in handling juveniles. He wrote in 1949 in *Juvenile Delinquency:* "The presumption is commonly adopted that since the State has determined to protect and save its wards, it will do no injury to them through its diverse officials so that these children need no due process protections against injury. Several exposures to court; a jail remand of days, weeks, or even months; and a long period in a correctional school with young thieves, muggers, and murderers—these can do no conceivable harm if the State's purpose be beneficent and the procedure be 'chancery'. Children are adjudicated in this way every day with-

out visible manifestations of due process. They are incarcerated. They become adult criminals, too, in thankless disregard of the State's good intentions as *parens patriae.*"

Scholars, who work in the field of juvenile offenders, are harmonious in their views that Gault was long overdue. Some of their conclusions are collected in the transcript of recent programs sponsored by The Institute of Continuing Legal Education, published in the volume entitled, *Gault: What·Now for the Juvenile Court?* (1968). Norval Morris, Professor of Law and Criminology, University of Chicago, said: "What I have anxiety about are the reality problems which develop when these types of rescue operations become institutionalized. What happens is that rescue operations are likely to ignore the preferences of those who are to be rescued. * * * If an inquisitorial, nonadversary system is right for children, why is it not right for adults? If benevolence is what guides us, why should benevolence stop short with children? The case was not easy to make even before Gault, but certainly after Gault it is impossible."

Henry H. Foster, Professor of Law, New York University, said: "The commendable objectives of juvenile court legislation, whether illusory or not, never did justify the abandonment of the accumulated wisdom and experience of the common law." He quotes Gault for the idea that the informal procedures, "contrary to the original expectation, may themselves constitute a further obstacle to effective treatment of the delinquent to the extent that they engender in the child a sense of injustice provoked by seemingly all-powerful and challengeless exercise of authority by judges and probation officers." He concludes:

"The infatuation of law with behavioral science has not been a happy one whenever law has forsaken her traditional character. A court is a court is a court. Dignity, decorum, fair procedure, and tradition are essential to and expected of the judicial process * * *.

"* * * * * *

"In retrospect, it seems incredible that we should ever have abdicated the judicial function of fact finding or have departed from the lessons every real lawyer knows in his bones. Moreover, it is not good social work, criminology, or psychiatry, to treat people unfairly, to deny them due notice or to deprive them of a fair hearing."

Robert D. Vinter, Associate Dean and Professor of Social Work, School of Social Work, University of Michigan, said: "If it did nothing else, however, Gault affirmed that juvenile proceedings cannot be justified as feasting on a different kind of law and thereby immune from the requirements of due process and constitutional privileges."

These conclusions had been published in the Report of the President's Commission on Law Enforcement even before Gault. Instead of getting children into juvenile court to help them, the Report concluded that the pronouncement of delinquency should be used only as a last resort, and it recommended that the range of conduct for which courts intervene should be narrowed. "Serious consideration, at least, should be given to complete elimination of the court's power over children for non-criminal conduct." But, when a case does reach court level, the Report said:

"Court adjudication and disposition of those offenders should no longer be viewed solely as a diagnosis and prescription for cure, but should be frankly recognized as an authoritative court judgment expressing society's claim to protection * * *. Accordingly, the adjudicatory hearing should be consistent with basic principles of due process."

A juvenile court, therefore, which works with juveniles at the adjudicatory stage, is at last a court; a court which sits to resolve issues under principles of due process, which is the best method yet devised for fair play. Gault accords a juvenile at the adjudicatory stage the due process

rights to notice, counsel, confrontation and cross-examination, and the privilege against self incrimination that any other person charged with a felony receives. In according these rights and privileges Gault took note of "the awesome prospect of incarceration in a State institution," and so did Kent. It took notice of the proceeding in which "the issue is whether the child will be found to be 'delinquent' and subjected to the loss of liberty for years." It said "There is no difference in this respect between adult and juvenile proceedings *of the sort here involved.*" (Emphasis added).

### The Reasonable Doubt Rule and Due Process

The real question then is not what is best for Santana; it is whether the reasonable doubt standard in a proceeding of a felony grade which may lead to a deprivation of liberty, is a part of due process. Why does the law recognize a division in standards of proof? The reasons for the "preponderance of evidence standard are found in the policy of the law to indulge no presumption in favor of either party to a dispute of a civil nature, or one between persons or entities in cases involving pecuniary damages or civil status, when, even in the event of loss, the party may retrieve his loss by his future efforts. Criminal cases have required the presumption of innocence as well as the greater measure of proof because the law has learned that one's liberty, reputation, future livelihood, career, or even one's life may depend upon the outcome. It is for that reason that one is presumed innocent of crime, while a civil litigant is not presumed correct in his claim or defense. See Underhill, Criminal Evidence, 4th Ed. § 7 (1935). "This rule is obviously based upon broad principles of humanity, which forbid the infliction of punishment until the commission of the crime is to a reasonable certainty established. It has received the sanction of the most enlightened jurists in all civilized communities, and in all ages; and with the increasing regard for human life and individual security, it is quite apparent that the

energy of the rule is in no degree impaired." 30 Am.Jur.2d Evidence, § 1170.

A jury and a reviewing court perform differently when testing a record under the two rules. Under the preponderance of the evidence standard, a finding may be supportable as tipping the scales even by weak circumstances, so long as the inferential leap is not too great. A search of the record for direct evidence or strong circumstances is the limit of a review. A trial by the reasonable doubt standard compels a conviction of the mind. Here a search of the record of evidence which compels a moral, not an absolute, certainty of the truth is required.

An adult charged with a felony, "however degraded or debased he may be, and no matter what may be the enormity of the crime charged against him, must always be presumed innocent of the crime for which he is indicted until his guilt is proved beyond a reasonable doubt." Underhill's Criminal Evidence, § 41 (4th ed. 1935); Powell v. State of Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). Such is the rule in all states of this Union. Few precedents concerning the rule have been written by the United States Supreme Court, which is understandable because of the universality of the principle. Coffin v. United States, 156 U.S. 432, 15 S.Ct. 394, 39 L.Ed. 481 (1894), traces the rule to the common law as well as the Roman law. Mr. Justice White wrote the opinion, and while his historical research has been criticized by Thayer in his, "A Preliminary Treatise on Evidence at the Common Law, (1898), at pages 551–576; Thayer attributes substantially the same statement of the rule of presumptive innocence to Bracton as early as 1260, and also to a number of later English decisions. Thayer, supra, 553. Cf. IX, Wigmore on Evidence (§§ 2497, 2498, 3rd ed. 1940). In 1958 the United States Supreme Court said in Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958):

"Where one party has at stake an interest of transcending value—as a crim-

inal defendant his liberty—this margin of error is reduced as to him by the process of placing on the other party the burden of producing a sufficiency of proof in the first instance, and of persuading the factfinder at the conclusion of the trial of his guilt beyond a reasonable doubt. Due process commands that no man shall lose his liberty unless the government has borne the burden of producing the evidence and convincing the factfinder of his guilt." 357 U.S. 513, 78 S.Ct. 1332 (1958).

In Brooks v. United States, 164 F.2d 142 (5th Cir.1947) the court said:

"[D]ue process as to each defendant required for a conviction that the evidence be strong enough to exclude every other reasonable hypothesis than the guilt of that defendant of the precise conspiracy charged."

United States v. Costanzo, 395 F.2d 441 (4th Cir.1968), in discussing the standard of proof required in a juvenile case, discussed the "reasonable doubt" standard and said it was a part of due process. Its language is instructive:

"For nearly two centuries this higher standard of proof required in criminal cases has been recognized as a basic procedural safeguard and has been adopted by virtually every jurisdiction in this country. See IX, Wigmore on Evidence, § 2497 (3rd ed., 1940, Supp.1964); see also McCormick, Evidence, § 321 (1954). The Supreme Court has termed the Government's obligation to prove every element of the offense beyond a reasonable doubt 'a settled standard of the criminal law.' Holland v. United States, 348 U.S. 121, 138, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954). In Brinegar v. United States, 338 U.S. 160, 174, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949), the Court observed that, 'Guilt in a criminal cause must be proved beyond a reasonable doubt,' and explained that requirement in Speiser v. Randall, 357 U.S. 513, 525–526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460

(1957), noting: 'Where one party has at stake an interest of transcending value —as a criminal defendant his liberty— * * * [the Government has the burden] of persuading the factfinder at the conclusion of the trial of his guilt beyond a reasonable doubt. Due process commands that no man shall lose his liberty unless the Government has borne the burden of producing the evidence and convincing the factfinder of his guilt.' *A juvenile's liberty demands no less protection."* (Emphasis added).

### Unsettled State of The Law

Juvenile cases, decided after Gault, have not been consistent in their decisions concerning the measure of proof. Some have held the reasonable doubt rule should be followed, either because of due process or upon principles of equal protection. In re Urbasek, 38 Ill.2d 535, 232 N.E.2d 716 (1968); United States v. Constanzo, 395 F.2d 441 (4th Cir.1968). Others have approved the preponderance of the evidence standard. In re Dennis M., 75 Cal.Rptr. 1, 450 P.2d 296 (1969); In re Ellis, 253 A.2d 789 (D.C.App.1969); In the Matter of Samuel W., 24 N.Y.2d 196, 299 N.Y.S.2d 414, 247 N.E.2d 253 (1969); In re Agler, 15 Ohio App.2d 240, 240 N.E.2d 874 (1968); State v. Arenas, 453 P.2d 915 (Or.1969). A plethora of law review articles and notes is equally in disagreement.

One case needs discussion, since its history is the occasion for this opinion. This court at first refused the application for writ of error and approved the decision of the court of civil appeals which held that the standard for proof in juvenile adjudicatory hearings was the reasonable doubt rule. After the United States Supreme Court noted probable jurisdiction in DeBacker v. Brainard, 183 Neb. 461, 161 N.W.2d 508 (1968), we granted the writ in this case. In my opinion DeBacker should be reversed without regard to the question about standard of proof. The court wrote twelve pages about the right of Nebraska to deny a juvenile a jury trial

and one casual paragraph about the standard of proof. Santana had a jury trial and that point is not before us. The majority of the court in DeBacker correctly held that the proof should be beyond a reasonable doubt. The majority also held that the juvenile was entitled to a jury trial. However, the Nebraska Constitution requires more than a mere majority to declare a law unconstitutional, so notwithstanding the majority views, that view failed, and the juvenile wound up without a jury trial and without a trial by the reasonable doubt rule. Where are we? The majority upheld both of the juvenile's contentions, yet had to deny them. Moreover, the minority but prevailing view was voiced in an opinion which picked a fight with the Supreme Court about Gault. Sound reasons existed for the Supreme Court's taking jurisdiction of the DeBacker case. The Supreme Court, either in that case or this one, can settle this problem.

Liberty is our real concern. Perhaps no greater harm could come to Santana than the State's misguided efforts to rehabilitate him if, in fact, he is innocent to begin with. His plea is that he wants fairness first; therapy second. With equal logic, one could have reasoned before Gault that the benefits of treatment accorded a juvenile are so helpful and beneficial to the juvenile that the State can be careless in notifying him or his parents about the offense, or providing him a lawyer, or permitting hearsay from an absent complainant, or by tolerating his self incrimination. The rights which Gault accords a juvenile reduce the chances for unfairness and injustice. The reason for the reasonable doubt rule is no different.

The Uniform Juvenile Court Act, as finally drafted and adopted in August, 1968, like Urbasek, in my opinion, follows the spirit of fairness which surfaced after six decades, in Gault. It would require proof beyond a reasonable doubt. Section 29b of the proposed act provides:

"If the court finds on proof beyond a reasonable doubt that the child committed the acts by reason of which he is alleged to be delinquent or unruly it shall proceed immediately or at a postponed hearing to hear evidence as to whether the child is in need of treatment or rehabilitation and to make and file its findings thereon. In the absence of evidence to the contrary evidence of the commission of acts which constitute a felony is sufficient to sustain a finding that the child is in need of treatment or rehabilitation. If the court finds that the child is not in need of treatment or rehabilitation it shall dismiss the proceeding and discharge the child from any detention or other restriction theretofore ordered."

The Texas Juvenile Act does not provide for adjudications of juveniles by the preponderance of the evidence rule, and no decisions of this court have so held. Generally it has been held by this court, that while constitutional rights of juveniles must be protected, procedures should be those used in civil cases. State v. Thomasson, 154 Tex. 151, 275 S.W.2d 463 (1955); Dendy v. Wilson, 142 Tex. 460, 179 S.W.2d 269, 151 A.L.R. 1217 (1944). This court can and should accord the fairer and more protective rule of reasonable doubt without impairing the Juvenile Law and the philosophy of our former opinions even though the Supreme Court should ultimately hold that a preponderance of the evidence is satisfactory in delinquency trials.

I would hold that a juvenile, at the adjudicatory stage, when his liberty is at issue, has the right to have his denial of the accused act tested by the standard, beyond a reasonable doubt. I would affirm the judgment of the court of civil appeals.

SMITH and STEAKLEY, JJ., concur.

SMITH, Justice (dissenting).

I am in perfect agreement with Mr. Justice Pope's dissenting opinion wherein he challenges the holding of the Court that the preponderance of the evidence standard is to be applied in determining the question

of whether a minor charged with a major crime, as here, is a delinquent. This dissent is concerned only with a question not discussed, which is whether or not the Respondent, George Rivera Santana, has been afforded constitutional procedural due process where, admittedly, the Petitioner, The State of Texas, was permitted over objection to file a Trial Amendment on the day of trial, whereby the offense orginally charged, that of assault with intent to commit rape, was abandoned and for the first time, the Respondent was charged in the pleadings with the greater offense of rape. As stated in the Court's opinion, the State first filed its petition on December 13, 1966, alleging that Santana had committed an *assault with intent* to rape. Thereafter, the State filed two amended pleadings alleging the same act of delinquency, i.e., assault with intent to commit rape. No objection was lodged against these amendments. However, the following proceedings demonstrate conclusively that Santana was deprived of the safeguards afforded by the Bill of Rights, especially notice as provided in the Sixth Amendment. The record shows that Santana was charged with an infamous crime, rape, and put to trial without adequate notice, on February 2, 1967. Prior to that date, the State's pleadings charged that Santana "has heretofore, in Lubbock County, Texas, on the 8th day of December, 1966, violated a penal law of this State of the grade of a felony, in and upon Frone Mintz, a woman, did make an assault with the *intent then and there to commit the offense of rape* upon Frone Mintz by then and there without the consent of the said Frone Mintz *attempt by force, threat, and fraud, to* have carnal knowledge of her, the said Frone Mintz." Emphasis added.

On February 2, 1967, the date of trial, the trial court, over objection, permitted the State to file a trial amendment so as to allege the following:

"The said child is a delinquent child by reason of the existence of the following facts: The said George Rivera Santana has heretofore, in Lubbock County, Tex-

as, on the 8th day of December, 1966, violated *a penal law* of this State of the *grade of a felony,* in and upon Frone Mintz, a woman, with the intent, then and there commit the offense of rape upon Frone Mintz by then and there, without consent of the said Frone Mintz, by force and threats, have carnal knowledge of her, the said Frone Mintz." Emphasis added.

The prayer following this charge reads, in part:

"Wherefore, premises considered, it is respectfully prayed that this cause be set down for a hearing on some day and date and at a place to be fixed by the Court, * * *."

The trial court, in lieu of setting the hearing sufficiently in the future to give Santana proper notice and time to prepare his defense to the new penal offense, overruled Santana's objections and exceptions to the filing of the trial amendment and proceeded with the trial on February 2, 1967. The objections were:

"George Santana would further object to the amendment of said charge for the reason that said petition charging him with said offense [rape] was never served upon him prior to the time this case was called for trial, and therefore, has had insufficient time to prepare said case, and the said George Santana claims surprise, and for said reason said George Santana is prejudiced, and unable to adequately prepare his defense to same."

The trial court attached the following qualification to Respondent's Bill of Exceptions:

"The above and foregoing objections to State's Trial Amendment, having been duly and timely presented to the Court, before any pleadings were read to the jury, and having been considered by the Court, the said objections as above stated are hereby qualified by the Court as follows: Prior to the commencement of the hearing on February 2, 1967, and before the case had been called, the State filed

said Trial Amendment now objected to and *the Court informed the child's counsel in open court,* that the Court would consider any objection, but that if counsel for the child were surprised and/or had not had time to prepare for the child's case, that the Court would continue this case and set it down for trial at a later time before a jury, and the child's counsel did decline to ask for a continuance of the trial of this case, and it proceeded to trial. All of the above objections, as set out in the qualifications, having been considered by the Court, the same are overruled, to which action and ruling of the Court George Rivera Santana in open court, through his attorneys, excepted." Emphasis added.

This action of the trial court was harmful to the child involved in that the Court deprived Santana of a fair trial even under recognized Civil procedure much less under criminal procedure. Be that as it may, Respondent's exception to the qualification rendered the qualification ineffective. Therefore, the qualification should not prejudice Respondent's rights.

As said by Mr. Justice Black in his concurring opinion in *Gault,*

"[t]he juvenile court planners envisaged a system that would practically immunize juveniles from 'punishment' for 'crimes' in an effort to save them from youthful indiscretions and stigmas due to criminal charges or convictions. I agree with the Court, however, that this exalted ideal has failed of achievement since the beginning of the system."

This is true in the present case. There was no justification for the trial court, in open court, placing Santana in the position of acknowledging that he was guilty of rape. When the trial court stated in the so called qualification that counsel for Santana declined to plead surprise to the charge of rape, it very well created the impression that Santana knew from December 8, 1966, that he was guilty of rape even though he was only charged with assault with intent

to commit rape. Under the theory that in civil cases pleadings in Texas may be amended "at such time as not to operate as a surprise to the opposite party"; provided that if the amendment is tendered within seven days of the trial, leave to amend may be granted by the trial court, "[unless] such amendment will operate as a surprise to the opposite party." Rule 63, Texas Rules of Civil Procedure. Santana has been convicted of a felony without regard to the Constitution which requires "that he be tried in accordance with the guarantees of all the provisions of the Bill of Rights made applicable to the States by the Fourteenth Amendment." This child was entitled to no less than that afforded an adult. While it is true that Santana had attorneys and had an inadequate trial by jury in the sense that he was prosecuted under civil procedure, nevertheless, the power of the State denied to him the safeguards, such as that which reads:

"In all criminal prosecutions, the accused shall enjoy the right * * * to be informed of the nature and cause of the accusation."

He was deprived of the right to stand before a properly organized jury of his peers and in response to the Court's arraignment, plead "not guilty".

There is another feature of this case which needs emphasis. The State of Texas is Petitioner here. The record is here without a statement of facts. This Court has no way of knowing what prompted the State to change its pleadings. Did the alleged injured person relate facts to the officers in the first instance that excluded the offense of rape? Is it possible that she related facts showing that rape was committed, but the officials concluded to limit the charge to the lesser offense? Did she suddenly decide on February 2, 1967, nearly two months after the date of the alleged offense, to add to the story she first told? If this conviction is allowed to stand, the Court will never know the true answer to these questions. Santana, if tried under the procedure contemplated and specifically

granted by provisions of the Fifth and Sixth Amendments which the Fourteenth Amendment makes applicable to the States, would have been in a rightful position to compel the State to discharge its burden of proving his guilt by legal and competent evidence beyond a reasonable doubt. It is argued that Santana did not request the Clerk to send with the record a statement of facts. That is just the point. No appellate court can adequately consider or should want to consider an appeal in a criminal case of this nature without a statement of facts. Whereas, in a civil proceeding, the parties are bound by the strict rules governing appeals.

The Court of Civil Appeals for the Seventh Supreme Judicial District of Texas, at Amarillo, reversed the judgment of the trial court on other grounds and did not pass upon the question herein considered. However, the Court said:

" * * * the Supreme Court in *Gault* clearly sets out the requirements of 'notices of charges' in the following language: 'Notice, to comply with due process requirements, must be given sufficiently in advance of scheduled court proceedings so that reasonable opportunity to prepare will be afforded, and it must set forth the alleged misconduct with particularity.' "

A continuance to a later date would have merely resulted in a trial under Civil rules wholly inadequate to meet the requirements of the Constitution of the United States.

This dissent seeks to supplement the forceful dissent filed by Mr. Justice Pope by bringing into focus a question which has been paramount from the beginning of this case. I believe it to be the law of the land that when a minor is charged with a crime, that minor is entitled to be tried by the same standards as an adult charged with the same or similar offense. It is incredible to believe that it was ever intended that juvenile proceedings to determine delinquency, such as we have here, should be regarded as anything less than "criminal". This minor is entitled to be tried under the law of the land and not under "laws or proclamations specifically promulgated to fit particular cases or to attach new consequences to old conduct". As said in *Gault*:

"It would be entirely unrealistic to carve out of the Fifth Amendment all statements by juveniles on the ground that these cannot lead to 'criminal' involvement. In the first place, juvenile proceedings to determine 'delinquency,' which may lead to commitment to a state institution, must be regarded as 'criminal' for purposes of the privilege against self-incrimination. To hold * otherwise

*[387 U.S. 50]

would be to disregard substance because of the feeble enticement of the 'civil' label-of-convenience which has been attached to juvenile proceedings."

The procedure herein advocated can be adopted and at the same time be kept within the framework of the Juvenile Act of the State of Texas.

Finally, the Court states that Santana "pleaded a denial to the charges and alibi; i.e., he was at home with his family when the alleged event took place." This leaves the implication, at least, that since the defense was that of "alibi", Santana was prepared on February 2, 1967, to meet either charge. This does not necessarily follow. For example, the defense of "alibi" would not be inconsistent with the additional defense of impotence or some physical defect which would prevent the accomplishment of the crime of rape. Santana was not and should not be required to disclose before trial his defenses. Requiring a minor to file defensive pleadings is equivalent to compelling the juvenile, in effect, to testify against himself. The manner of trial of this case relieved the State of its burden to establish the guilt of the respondent beyond a reasonable doubt.

For the reasons stated, I would affirm the judgment of the Court of Civil Appeals which reversed the judgment of the trial court and remanded the cause to the lower court for a new trial.