

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-21-00235-CV

———————————————

IN THE MATTER OF C.O., A JUVENILE

---

On Appeal from the 323rd District Court
Tarrant County, Texas
Trial Court No. 323-115526-21

---

Before Kerr, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

## I. Introduction

On August 1, 2020, two seventeen-year-olds, M.F.-B. (Marisa) and E.T. (Ellen), arranged via Snapchat to rendezvous in the parking lot of a Bedford pharmacy to sell THC[1] cartridges to a stranger. The drug sale went awry when the buyer, sitting in the back seat of Marisa's car, pistol-whipped Marisa in the head and then shot her and fled with some of the THC cartridges. Marisa died from her wounds. Appellant C.O.'s DNA was found on the rear door handle of Marisa's car and an iPhone connected to him was found on the car's back seat floorboard.

In its petition to transfer jurisdiction from the juvenile court to the district court so that C.O. could be tried as an adult,[2] the State alleged (1) that C.O. had engaged in delinquent conduct by committing capital murder (intentionally shooting and killing Marisa during the course of committing or attempting to commit a robbery), *see* Tex. Penal Code Ann. § 19.03, and (2) that C.O. had engaged in delinquent conduct by committing aggravated robbery on the same facts, *see id.* § 29.03. After a hearing, the juvenile court transferred C.O.'s case.[3] *See* Tex. Fam.

---

[1]THC is an abbreviation for tetrahydrocannabinol, which is the active ingredient in marijuana. *Harper v. State*, 508 S.W.3d 461, 466 n.7 (Tex. App.—Fort Worth 2015, pet. ref'd).

[2]C.O. stipulated that he was sixteen at the time of the alleged offenses.

[3]A juvenile court may waive its exclusive original jurisdiction and transfer a juvenile case to the appropriate district court for criminal proceedings if certain

2

Code Ann. § 54.02 (setting out the circumstances under which a juvenile court may waive its jurisdiction and transfer a case); *see also id.* § 56.01(h) (stating that an appeal from an order that waives jurisdiction under Section 54.02 and transfers a child to criminal court for prosecution "has precedence over all other cases").

In two points, C.O. complains that there were defects in the State's pleadings and notice because the State did not plead an "on or about" date for the capital murder and that the juvenile court's misunderstanding of the four factors set out in Family Code Section 54.02(f), which the juvenile court must consider to waive its jurisdiction, caused an erroneous judgment. We affirm.

## II. Due Process

In Paragraph 1 of the State's petition, the State alleged that

Respondent has been brought within the jurisdiction of this juvenile court in that there is probable cause to believe that Respondent has committed a felony violation, namely Section 19.03 of the Texas Penal Code punishable by imprisonment, namely that in the County of Tarrant and State of Texas, did intentionally cause the death of [Marisa], by shooting [Marisa] with a deadly weapon, to-wit: A firearm, and the said Respondent was in the course of committing or attempting to commit the offense of robbery[.]

Unlike Paragraph 1, Paragraph 2 of the State's petition contained an "on or about" date:

Respondent has been brought within the jurisdiction of this juvenile court in that there is probable cause to believe that Respondent has committed a felony violation, punishable by imprisonment, namely

statutory and constitutional requirements are met. *Ex parte Thomas*, 623 S.W.3d 370, 372 (Tex. Crim. App. 2021).

Section 29.03 of the Texas Penal Code when *on or about the 1st day of August, 2020*, in the County of Tarrant and State of Texas, did intentionally or knowingly, while in the course of committing theft of property and with intent to obtain or maintain control of said property, cause bodily injury to another, [Marisa], by shooting [Marisa] with a firearm and/or by striking [Marisa] with a firearm, and the respondent used or exhibited a deadly weapon, namely a firearm.  [Emphasis added.]

At the beginning of the transfer hearing, the juvenile court noted "there's no 'on or about' on the first paragraph."  The prosecutor and defense counsel then held a brief off-the-record discussion.  The prosecutor informed the juvenile court that "we just did a trial supplement, both sides have signed, just adding the date before that first paragraph."  The supplement, filed that morning with the juvenile court and signed by the prosecutor and defense counsel, but not C.O., added an "on or about" date of August 1, 2020.  That is, it reflected the same date as the second offense paragraph, and both offenses were based on the same facts.  C.O. then stipulated to the following facts:  his legal name, his age at the time of the hearing (17 years old), his birthdate, the alleged offense date (August 1, 2020), his age on the date of the alleged offense (16 years old), and the name of his guardian and her address.

In his first point, C.O. complains that the capital-murder charge was improperly before the juvenile court when the failure of the State to allege an "on or about date" in the first paragraph constituted a fatal variance.[4]  Specifically, he argues

---

[4]In criminal law, the "on or about" language of an indictment allows the State to prove a date other than the one alleged in the indictment as long as the date proved is anterior to the indictment's presentment and within the statutory limitations period. *See* Tex. Code Crim. Proc. Ann. art. 21.02(6).  When an indictment alleges that a

4

that the failure to include the "on or about date" prevented a determination that "the date of the alleged offense is anterior to the presentment and filing of the Petition to Waive Jurisdiction" and that C.O. was at least ten years old when the offense was committed. C.O. relies on Family Code Sections 51.09[5] and 53.04(d)(1)[6] to argue that the State's petition had to state "with reasonable particularity the time, place and manner of acts alleged," that filing the trial supplement after the case had been called functioned to reset the trial timetable, and that there is nothing in the record to reflect that C.O., knowing that he faced a "supplemental" capital-murder charge, was ready to continue an already-in-progress transfer hearing. C.O. further argues that a trial supplement alleging a capital murder must be classified as "written matter to be considered" under Family Code Section 54.02(e) that should have been provided to him five days before the hearing. *See id.* § 51.10(h) (stating that the defense attorney is

---

relevant event transpired on or about a particular date, the accused is put on notice to prepare for proof that the event happened at any time within the statutory limitations period. *See Thomas v. State*, 444 S.W.3d 4, 9 (Tex. Crim. App. 2014).

[5]Section 51.09 provides that unless a contrary intent clearly appears elsewhere in Title 3 (Juvenile Justice Code), any right granted to a child by Title 3 or by the state or federal constitution or laws may be waived in proceedings under Title 3 if: (1) the waiver is made by the child and the child's attorney; (2) the child and attorney waiving the right are informed of and understand the right and the possible consequences of waiving it; (3) the waiver is voluntary; and (4) the waiver is made in writing or in court proceedings that are recorded. Tex. Fam. Code Ann. § 51.09.

[6]Section 53.04(d)(1) requires a petition for a transfer hearing to state "with reasonable particularity the time, place, and manner of the acts alleged and the penal law or standard of conduct allegedly violated by the acts." Tex. Fam. Code Ann. § 53.04(d)(1).

entitled to ten days to prepare for any transfer hearing), § 54.02(e) (stating that five days prior to a transfer hearing, the trial court must provide defense counsel and the prosecutor with access to all written matter to be considered by the court).

The State responds that C.O.'s stipulation established the missing jurisdictional fact—namely, the date of the offense—and that the State adequately amended its petition. The State alternatively responds that C.O.'s stipulation "acted as an effective waiver, regardless of the State's trial supplement."

A child in a juvenile delinquency proceeding is entitled to due process because the proceedings may result in the child's being deprived of liberty. *In re C.H.*, 412 S.W.3d 67, 75 (Tex. App.—Fort Worth 2013, pet. denied). Like in other civil cases, though, juvenile pleadings may be amended if they do not surprise or prejudice the opposing party. *State v. Santana*, 444 S.W.2d 614, 622 (Tex. 1969), *vacated on other grounds*, 397 U.S. 596 (1970) (remanding for reconsideration in light of *In re Winship*, 397 U.S. 358 (1970), in which the U.S. Supreme Court held that the juvenile adjudication-stage burden of proof is beyond a reasonable doubt); *see Carrillo v. State*, 480 S.W.2d 612, 615 (Tex. 1972).

Put differently, amending a petition near the end of a proceeding may be unfair, constituting a due process violation. *See Carrillo*, 480 S.W.2d at 615. In *Carrillo*, a juvenile theft case, the pleading amendment occurred after trial had begun and toward the trial's end; the tendered amendment set out a different owner of the property; and the juvenile's counsel insisted that surprise and prejudice had occurred.

6

*Id.* The court noted that "the strict prohibition against amendment of pleadings applicable in criminal cases is not applicable in juvenile proceedings" but concluded that the amendment had occurred "at such a time and under such circumstances as to be prohibited, as a matter of due process." *Id.* at 615.

In contrast, in *Santana*, the State filed a petition alleging that the juvenile had committed an assault with intent to rape, and then two months later, on the day of the hearing, the State amended its petition to change the allegation to rape. 444 S.W.2d at 622. The trial court offered the juvenile a postponement if he was surprised or needed additional time to prepare his case, but his counsel did not request a postponement. *Id.* Accordingly, the supreme court held that the juvenile was not deprived of due process, i.e., an essentially fair trial. *Id.*

We note initially that, here, in addition to the two offense paragraphs, the State's petition stated that C.O. was seventeen years old when the petition was filed in March 2021, set out his September 2003 birthdate, and alleged that C.O. had been "15 years of age or older at the time [he] is alleged to have committed the offense(s)." Further, both offenses listed the same victim, the same place, and the use of a firearm. Accordingly, none of the procedural errors that C.O. complains about violated his due process rights because the petition identified, with reasonable particularity, the timing of the offenses for which the State sought transfer: the petition alleged that sometime between his fifteenth and seventeenth birthday (i.e., between 2018 and 2020), C.O. shot and killed Marisa while committing a robbery (the capital murder) in Tarrant

County and that he committed an aggravated robbery, while using or exhibiting a deadly weapon (firearm), of Marisa on or about August 1, 2020, in Tarrant County. *Cf. In re T.L.K.*, 316 S.W.3d 701, 703 (Tex. App.—Fort Worth 2010, no pet.) (holding petition was fatally defective for failing to state with reasonable particularity the "place" where the alleged delinquent conduct occurred, in violation of Section 53.04).

Additionally, there is no indication in the record that C.O. was surprised or prejudiced by the omission of the August 1, 2020 date in the capital-murder paragraph or that he sought a continuance in response to the petition's amendment. *See* Tex. Fam. Code Ann. § 51.17(a) (stating that, apart from exceptions not applicable here, "the Texas Rules of Civil Procedure govern proceedings under this title"); Tex. R. Civ. P. 63 (stating that amendments filed within seven days of trial shall be filed only after leave of the judge is obtained, and that such leave shall be granted unless there is a showing that such filing will operate as a surprise to the opposite party), 66 (requiring objecting party to show that the allowance of a trial amendment would prejudice him and providing that the trial court may grant a postponement); *Greenhalgh v. Serv. Lloyds Ins. Co.*, 787 S.W.2d 938, 939 (Tex. 1990) ("The burden of showing prejudice or surprise rests on the party resisting the amendment.").

To the contrary, after the juvenile court judge pointed out the omission, C.O.'s counsel signed a "supplement" that inserted the omitted date—the same on-or-about date as the aggravated-robbery paragraph—into the capital-murder paragraph. *See Hardin v. Hardin*, 597 S.W.2d 347, 349–50 (Tex. 1980) (stating that a trial court's ruling

8

under Rule 63 will not be disturbed without a clear showing of an abuse of discretion); *see also Carrillo*, 480 S.W.2d at 615 (requiring basic fairness for a juvenile-proceeding amendment to satisfy due process); *In re R.C.*, No. 13-08-00334-CV, 2010 WL 411873, at *8 (Tex. App.—Corpus Christi–Edinburg Feb. 4, 2010, no pet.) (mem. op.) ("We find no abuse of discretion here, where appellant did not even claim surprise, declined more time to respond, and in fact reiterated to the trial court he was ready to proceed with the trial."). Finally, to the extent there may have been a statutory error by the trial court, it was harmless under these circumstances, *see In re C.O.S.*, 988 S.W.2d 760, 767–68 (Tex. 1999),[7] in light of C.O.'s stipulations to facts that established the juvenile court's jurisdiction, and we overrule C.O.'s first point. *Cf. T.L.K.*, 316 S.W.3d at 703 (fatally defective petition deprived juvenile court of jurisdiction).

---

[7]In *C.O.S.*, the juvenile was adjudicated delinquent (aggravated sexual assault of two minors), given a determinate sentence, and remanded to the custody of the Texas Youth Commission. 988 S.W.2d at 762. The court of appeals affirmed, and on appeal to the supreme court, C.O.S. argued that the trial court had failed to explain under Family Code Section 54.03(b) that his juvenile court adjudication record could be admissible in future adult criminal proceedings and that he had the right to confront witnesses. *Id.* The court held that he was not required to preserve these errors in the trial court before raising them on appeal because they were waivable-only under Court of Criminal Appeals jurisprudence but that the errors were harmless when there was no indication that if he had been told how the record in the case might be used in the future, he could have avoided an adjudication of delinquency and there was no indication that he had the opportunity to plead to a lesser offense as the basis for adjudication. *Id.* at 762, 766–68.

### III. Family Code Section 54.02(f) Factors

Section 54.02(f) sets out four factors that the juvenile court "shall consider, among other matters" in its transfer decision, and the Court of Criminal Appeals has recently overruled *Moon v. State*, 451 S.W.3d 28 (Tex. Crim. App. 2014), under which the juvenile court was previously required to set forth case-specific findings as to those factors. *See Thomas*, 623 S.W.3d at 372.[8] The factors are: (1) whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person; (2) the child's sophistication and maturity; (3) the child's record and previous history; and (4) the prospects of adequate protection of the public and the likelihood of the child's rehabilitation through procedures, services, and facilities currently available to the juvenile court. Tex. Fam. Code Ann. § 54.02(f).

In his second point, C.O. complains that because Section 54.02(f) is in legal "flux" thanks to *Thomas*, the juvenile court's explanation of its duties under that subsection "was a gross misstatement of its duties under this statute." Specifically, he complains about the juvenile court's opening remarks: "Now, I can put all the weight in one factor. I can equally divide between the four factors or I can put no weight in the four factors but simply consider them before I make my decision."

---

[8]In *Thomas*, the Court of Criminal Appeals stated that while detailed findings are preferable and helpful on appeal, "it's the hearing itself that prevents the transfer process from being arbitrary; the case-specific fact-findings are not necessary to protect a fundamental constitutional right." 623 S.W.3d at 381. The court noted that "[t]he statute does not mandate that any particular factor be true, state that the factors are exclusive, or limit the purpose for which the statutory factors may be considered." *Id.* at 382.

A juvenile court abuses its discretion when its transfer decision is arbitrary, given the evidence upon which it was based. *In re A.K.*, No. 02-20-00410-CV, 2021 WL 1803774, at *18 (Tex. App.—Fort Worth May 6, 2021, pet. denied) (mem. op.). By contrast, a transfer decision representing "a reasonably principled application of the legislative criteria" generally will pass muster under this standard of review. *Id.* The factors in Section 54.02(f) are nonexclusive factors that facilitate the juvenile court's balancing of the potential danger to the public posed by the juvenile offender with his "amenability to treatment," and any combination of these criteria may suffice to support a waiver of jurisdiction and transfer. *Id.* at *19. The State has the burden to persuade the juvenile court to transfer the case by a preponderance of the evidence. *Id.* (citing *In re K.W.*, No. 02-19-00323-CV, 2020 WL 98144, at *3 (Tex. App.—Fort Worth Jan. 9, 2020, no pet.) (mem. op.)).[9]

The State responds that C.O. has failed to preserve his complaint, that he failed to adequately brief his complaint on appeal by identifying which part—if any—of the

---

[9]C.O. complains that in *A.K.*, we cited to *In re J.R.*, No. 05-20-00920-CV, 2021 WL 777090, at *10 n.5 (Tex. App.—Dallas Mar. 1, 2021, pet. denied) (mem. op.), for the proposition that "there need not be evidence in support of every section 54.02(f) factor[] weighing in favor of transfer[,] so long as there is sufficient overall evidence to justify the juvenile court's decision." But we cited our own precedent in *A.K.* for that proposition. 2021 WL 1803774, at *19 (quoting *K.W.*, 2020 WL 98144, at *4); *see also K.W.*, 2020 WL 98144, at *4 (citing *In re C.M.M.*, 503 S.W.3d 692, 701 (Tex. App.—Houston [14th Dist.] 2016, pet. denied), for the proposition that the court need not find that each factor is established by the evidence). Further, although C.O. argues that *J.R.* "is currently before the Texas Supreme Court," the supreme court denied the petition for review on October 15, 2021, the same day that C.O. filed his brief in this court.

juvenile court's statement was a misstatement of law, that the complained-of statement was not a misstatement of law, and that, in any event, the complained-of statement was harmless.

Contrary to C.O.'s argument that the criteria set out by the juvenile court at the beginning of the hearing "fatally taints any decision rendered in this case," the evidence presented at the hearing, set out below, demonstrates that the statement was harmless. Because we conclude that the complained-of statement was harmless, we do not address the State's remaining arguments. *See* Tex. R. App. P. 47.1.

## A. Evidence

The juvenile court ordered a diagnostic study, social evaluation, and full investigation of the child, the child's circumstances, and the circumstances of the alleged offenses, including a social study and psychological evaluation, before hearing the State's petition. The diagnostic study was admitted into evidence at the July 9, 2021 transfer hearing and included C.O.'s April 6, 2021 psychological evaluation. Bedford Police Detective Nathan Noble, the lead investigator on the August 1, 2020 homicide, and C.O.'s juvenile probation officer, Elizabeth Huie,[10] testified at the hearing. Huie completed C.O.'s prediagnostic report.

---

[10]Huie did not meet C.O. in person until July 2, 2021, because he was part of her caseload of youth on probation "who reside outside of [Tarrant] [C]ounty," but she had spoken with him by phone. Out-of-county juveniles were supervised by a courtesy supervisor in another county, and Huie usually received case information through progress reports unless an issue arose requiring direct contact with the child and his family.

12

## 1. The offense

C.O.'s diagnostic study contained background information on the offenses, including Ellen's description of the shooter as a black male wearing a black "do-rag," a blue medical mask, and Nike slides, and her account of the events leading to the shooting. According to the study, a little after 6 p.m. on August 1, 2020,[11] the shooter arrived as a passenger in a silver vehicle. He walked up to Marisa's car window and asked for the THC cartridges. Marisa refused to turn them over until he paid for them. He walked back to the silver car and then returned, got into the back seat of Marisa's car with a gun and a phone, demanded to see the cartridges, and stated, "Give me the f-cking sh-t." Marisa again refused, at which point he threatened to "f-cking shoot" Marisa and then pistol-whipped her across her right brow before firing one shot, which entered the back of the right side of her neck and exited the front bottom left side of the neck before entering her arm. A photograph of Marisa's head injury was admitted into evidence. Marisa was later pronounced dead.

During cross-examination, Detective Noble agreed that when Ellen was first interviewed, she stated that she did not think the buyer had intended to shoot Marisa and that he had seemed surprised when the gun fired. Later, however, Ellen told detectives that she believed the buyer had intended to shoot Marisa. Ellen was unable to identify C.O. in a photo lineup.

---

[11]Detective Noble arrived at the pharmacy at 6:32 p.m., seventeen minutes after the shooting.

## 2. C.O.'s record and previous history

C.O. was seventeen years old at the time of his psychological evaluation. He was born in Las Vegas and moved to Texas with his mother before he started elementary school; his father had been incarcerated in Nevada for most of C.O.'s life. C.O. had attended school in Fort Worth, Arlington, Euless, and Groesbeck (where his grandparents lived), and he had numerous suspensions, including for truancy, fighting, possession of drug paraphernalia, and breaking into a car on campus. C.O. had received in-school suspensions five times since third grade and was sent to an alternative school four times.

From 2014 to 2018, C.O. ran away from home and lived "off and on" with his grandparents in Groesbeck because he did not get along with his stepfather, who he said had used a belt to whip him until C.O. was in sixth grade. C.O. reported that his substance abuse history began in the eighth grade and had included marijuana and alcohol. At one point during probation, C.O. had lived with a classmate's family until it was discovered that his classmate was also on probation.

C.O.'s first referral in the Tarrant County Juvenile System was on December 6, 2018, for theft of property $2,500 to $30,000. C.O. had stolen a key fob from a teacher, had gone into the school's parking lot, and had stolen a car. C.O. also earned a referral on December 31, 2018, because he had been seen walking through the parking lot pushing a key fob and attempting to open doors of several cars. When he found a car with an open door, he entered the vehicle, opened the trunk, and stole $4.

C.O. received deferred prosecution for these offenses and was sent to a drug and family counseling program.

C.O. received referrals in September 2019 for two counts of credit card abuse and burglary of a motor vehicle. C.O. had broken into a woman's car in the apartment complex where he lived and stole her iPhone, which he then used to make some purchases—food from Uber Eats and headphones from Amazon—under his own name.

C.O. received referrals in October 2019 for unauthorized use of a motor vehicle and evading arrest with that vehicle. Officers had found a stolen vehicle that was unoccupied but parked in an apartment complex and they conducted surveillance on it until a male individual got into the car and left. They followed, and at one point, the vehicle rolled through a stop sign, so they initiated a traffic stop. The car's driver sped up instead of stopping. A high-speed chase ensued until the stolen car turned onto a dead-end street. At that point, the driver leapt from the still-running car, which crashed into a tree. The driver, C.O., was apprehended as he tried to flee on foot.

C.O. was adjudicated delinquent and received a year's consolidated probation for the prior four felonies and single misdemeanor. He was referred to a family counseling program and to the probation department's mentoring program. C.O. "had just started [the mentoring program] when he went into [residential drug treatment]." C.O. had completed a drug and family counseling program, as well as 30

hours of community service, in his first probation and 80 hours of community service in his second probation. C.O. had also completed six weeks on an electronic monitor. C.O. began outpatient drug treatment through the probation department in January 2019 but due to his continued drug use,[12] he was placed in a residential drug-treatment program in February 2020.

C.O. never started the family counseling program because after he was released from residential treatment in April 2020, he "began running away from home" and moved back and forth between his grandparents and his uncle "quite a bit." C.O. told his probation officer that his mother had kicked him out of their Euless apartment in May 2020 and that he had begun living with his grandparents in Groesbeck again, while his mother reported that he had run away.

In May 2020, C.O. was found in a stolen vehicle while he was still on probation, and later that month, he was officially reported as a runaway and a directive to apprehend him (a juvenile warrant) was issued. On June 23, 2020, C.O. contacted his mother and asked her to pick him up at a truck stop. His mother did so and turned him in on the juvenile warrant. On the day of the murder, August 1, 2020, C.O. was around a month shy of turning seventeen and was supposed to be living with his grandparents.

---

[12]During probation, C.O. took ten drug tests between July 19, 2019 and February 24, 2021, and he tested positive for marijuana on all but two of his tests.

16

### 3. C.O.'s sophistication and maturity

The police found four phones in Marisa's vehicle. Two of the phones belonged to Marisa, and one of the phones belonged to Ellen. The remaining phone, a white iPhone, was found on the back-seat floorboard on the driver's side of the vehicle. Police extracted the iPhone's SIM card and traced its phone number and purchase information to a T-Mobile store where it had been activated the day before the shooting.[13] The shooter's phone was registered to C.O.'s grandmother's company, and C.O.'s mother had purchased the phone. Video footage from the T-Mobile store from the July 31, 2020 purchase showed C.O., his mother, and his uncle. When the group exited, C.O. appeared to be holding the newly purchased white Apple iPhone; he was wearing Nike slides, identified by Ellen as the shooter's footwear. The iPhone's GPS tracker showed that it was near C.O.'s uncle's residence until 5:50 p.m. on August 1, 2020, when it began traveling north until it reached the Bedford pharmacy at 6:10 p.m.

The iPhone's contents could not be downloaded because "[i]t appeared to be remotely wiped or in some sort of start-up sequence wiped to a factory reset."[14] However, one of Marisa's phones revealed a Snapchat conversation between Marisa

---

[13]Pursuant to a warrant, T-Mobile provided Detective Noble with security video of the purchase, the transaction receipts, the service agreement, and a copy of C.O.'s mother's driver's license.

[14]Detective Noble testified that he believed C.O. had taken steps to remotely wipe the phone.

and an individual with the username "lilbittywhore" and display name "Yari" that took place before the shooting. "Yari" is a shortened version of C.O.'s middle name. A search of the Snapchat account for "lilbittywhore" led to a photo of C.O.[15] Detective Noble used the Snapchat conversation and pharmacy surveillance video to build a timeline of events.

Detective Noble said that Marisa had gone into the pharmacy to use the restroom before the transaction and that she had messaged, "nah you gotta hop in mines," indicating in which vehicle the transaction would occur, and that she messaged "walking out" at 6:13 p.m. C.O.'s DNA was found on the exterior door handle of the driver's-side rear door of Marisa's vehicle.

Detective Noble spoke with C.O. and his mother. They both told him that C.O. had lost his phone on August 1 and that they had contacted T-Mobile and Assurance, a third-party insurance company, about the loss at around 6:30 p.m. that day. C.O.'s mother told Detective Noble that they had tried to find the phone but that the phone had appeared to be locked—i.e., not searchable by "Find My Phone"—so they had the phone cancelled instead. C.O. said that some friends had picked him up at 6 p.m. that day at his uncle's apartment in Arlington, that they went to a nearby McDonald's in east Arlington, that he went inside the restaurant and ordered food, and that they then returned him to his uncle's apartment. After they

---

[15]The Snapchat profile picture of "lilbittywhore" is a cartoon avatar of a black male with dollar signs over his eyes, with the display name "Yari," and a Virgo symbol, indicating a September birthdate. C.O. was born in September.

dropped him off, he realized his phone was missing, and he borrowed his cousin's phone to contact his friends to get them to return so he could retrieve his phone. They returned, but they were unable to find the phone in the car.

Detective Noble said that C.O. provided no identifying information other than first names for his alibi friends, with whom C.O. connected on social media, and that C.O. had refused to provide social-media information. Detective Noble obtained August 1, 2020 surveillance video of the inside counter and drive-thru window from the alibi McDonald's and watched the recording made from 5 p.m. to 8 p.m. that day but did not see C.O. Detective Noble obtained the contact information for C.O.'s uncle from C.O.'s probation officer after C.O.'s mother refused to provide that information; C.O.'s uncle was unwilling to cooperate with the investigation.

On December 24, 2020, Grand Prairie Detective Montanya contacted Detective Noble to let him know that C.O. was in a stolen vehicle. He was initially arrested but then quickly released. The car had been full of individuals of similar age, and Detective Montanya had released C.O. because she did not believe that he was the vehicle's driver. She gave Detective Noble information about C.O.'s new Instagram profile and told him that she recognized some members of the Bankroll gang in photos on the profile. A photograph of C.O.'s Instagram profile was admitted into evidence. The profile name was "playyboiikenn," and under an image of the Playboy bunny logo and "$KEN$," it listed tag lines, "Search for greater" and "Stay dangerous."

Huie stated that C.O. seemed to understand the allegations against him and that he could control his emotions when they spoke. She noted in the report that C.O.'s overall intellectual abilities fell "in the average range," he had no learning disorders, and he had no mental disease or defect that would substantially impair his capacity to understand the allegations against him, to understand the juvenile court proceedings, or to assist in his own defense.

### 4. Prospects for the public's protection and child's rehabilitation

Detective Noble said that C.O. was arrested for the August 1, 2020 shooting at his grandparents' home in Groesbeck on February 10, 2021.[16] When C.O. was arrested, there was a strong smell of marijuana in his room.

C.O. had a phone on him when he was arrested, and Detective Noble procured a search warrant for it and used the information from that phone to identify C.O.'s Instagram profile. Detective Noble also saw text-message conversations between C.O. and his mother that were admitted into evidence and demonstrated how C.O. failed to comply with his probation's conditions.

In a September 4, 2020 text-message exchange, C.O.'s Mother stated, "Ok we at the dispensary." C.O. asked her, "See if they have purple punch . . . or runtz . . . [o]r cookies." His mother replied, "Gotta buy cookies on la . . . . The ones here fake." When C.O. asked which dispensary, his mother replied, "Jardin," and then

---

[16]At the time of his arrest, C.O. was over six feet tall and weighed over 230 pounds; by July 2021, he had dropped 60 pounds.

added, "Eighth is $55," and "Purple punch." C.O. responded, "Ok I need tht." His mother stated, "Ok," and then added, "Have my money ready," and "Runtz are in Cali she said." Detective Noble said that this conversation was about C.O.'s mother's buying drugs for C.O.

A week after the above text-message exchange, in a September 11, 2020 virtual meeting between C.O.'s then-probation officer Cynthia Gonzales, C.O., and his mother, C.O. denied any substance use, and his mother reported that she thought he was staying drug-free and that she had not identified any suspicious behavior. Huie opined that neither of the statements were consistent with the text messages that indicated that C.O.'s mother had gone to a dispensary to buy THC for him.

C.O.'s mother was not on the September 16, 2020 virtual probation meeting. In a text earlier that day, C.O.'s mother told him, "I'm not gonna be on the call today. Don't answer any questions" and directed him to "[o]nly talk about school or your trip." C.O. did not give his address during the meeting and stated that they were staying at a hotel and that he did not know for how long. Huie stated that the probation department required probationers to give their addresses, even temporary addresses.

C.O. reported having suicidal thoughts while in juvenile detention but denied planning to harm himself. He also acknowledged having thoughts of harming others, stating, "Sometimes—I think—I feel like beating people up." He indicated that he had no "dreams" about what he would like his life to be and told his psychological

21

examiner that he had no clue about what he might want to do someday as far as work or a profession. The psychological examiner stated, "[C.O.] has no cognitive, developmental, or mental health problems which would raise concerns about him being adjudicated as an adult," and noted that apart from C.O.'s age at the time of the alleged offenses, there was "little to suggest [C.O.] would benefit from remaining in the juvenile system or would be too immature to handle adult court." C.O.'s last completed grade was ninth grade.

C.O. was detained on February 10, 2021, on the aggravated-robbery and capital-murder charges. He was sent to the Tarrant County Jail on February 17, 2021, because of the winter storm, and returned to juvenile detention on February 22. He was returned to the Tarrant County Jail on March 9 "because there was a drop in his supervision level in detention."

Between April 5 and June 1, 2021, C.O. incurred several infractions. In the first infraction, on April 7, C.O. threatened a detention officer by telling the detention officer that he was going to "[f]ind his whole family and kill them" and that he was going to "butt-f-ck his kids first and then kill them." The next infraction occurred on April 9, when C.O. tried to fight one of his peers. On April 11, a verbal altercation occurred after C.O. failed to follow instructions, and on April 14, C.O. was confined for major contraband (he had hidden a pen in the bathroom).

On May 28, when C.O. had just returned to the classroom after being confined, he refused to obey and tried to intimidate juvenile detention staff after he was

assigned to a different section. When they began giving him "physical prompts" to get him to walk where he needed to go, he became aggressive, "throwing his elbows toward the staff," which led to his physical restraint, first against the wall and then against the floor. The encounter was described as follows:

> And as they were securing his arm, he continued being combative and made multiple attempts to break free of the restraints.
>
> At that point, they were trying to put handcuffs on him and they were finally able to secure him and assisted him to his feet. And at that point, [C.O.] began spitting on them and made multiple threats to attack them and he was saying, "I'll find out where y'all live." He was then escorted to his room without further incident.

As a result of his infractions, he was transferred back to the Tarrant County Jail.

Huie opined that based on her review of C.O.'s records, he appeared to have become more aggressive and violent. C.O. had received several services through the probation department but was unable to start new ones because he would turn eighteen before he could complete them. She noted that C.O. had successfully completed some of the services but "that was some time ago." He did not successfully complete the most recent services he had been offered.

Huie noted that C.O.'s psychological evaluation stated that C.O. was "unlikely to benefit from treatment opportunities should he remain in the juvenile system," and that he "does not appear particularly immature or unsophisticated for his age," and that "he does not have a significant history of aggressive behavior prior to the alleged offenses." However, she agreed that the report was generated before C.O. made his

23

threats of violence against the detention center staff. C.O. had a total of ten referrals to the juvenile department and, of those, five were felonies.

While in the Tarrant County Jail, C.O. had been put on Prozac, and Huie agreed that Prozac's side effects could sometimes cause aggression and violence. He had been on another medication until February, "when his mother wanted him to stop taking it because she felt it was agitating him and causing a lot of aggressive behavior."

### 5. Arguments and order

At the conclusion of the transfer hearing, the State argued that there was sufficient cause to transfer C.O. to the district court because

- the alleged offenses were offenses against the person;

- C.O. had been one month and ten days shy of turning seventeen years old at the time of the offense and thus had the sophistication and maturity to be tried as an adult;

- C.O. had no cognitive, developmental, or mental health problems that would raise concerns about his being adjudicated as an adult;

- C.O.'s actions after the offenses—remotely wiping his phone and trying to create an alibi—and his previous felony-offense history made trying him as an adult appropriate; and

- C.O.'s prospects for rehabilitation—if he remained in the juvenile system for another year and two months—were low based on his receipt of previous services, his aggressive and violent interactions with juvenile staff, his needs, and the offenses being alleged.

C.O. responded by arguing that he had lacked a father figure because of his father's incarceration, he had had an abusive stepfather leading to post-traumatic stress disorder (PTSD),[17] it was mere speculation that C.O. had tried to remotely wipe his iPhone, there was sufficient evidence to show C.O. was not guilty of the offenses, and his aggressive behavior could be attributed to Prozac.

At the hearing's conclusion, the juvenile court granted the State's petition. The court explained that "the reason I'm transferring . . . this case to the adult criminal courts[] is because of [C.O.'s] extensive felony history" and because C.O.'s juvenile court rehabilitation efforts had "obviously failed as [his] behavior seems to have escalated to the point now that resulted in the death of an individual." The juvenile court noted, "I think you're making adult decisions and that you need adult consequences through the adult system." The juvenile court set C.O.'s bond at $5 million based on the threats C.O. had made to detention officers.

---

[17]C.O.'s mother, in her July 2021 parental written statement, asserted that C.O. had been diagnosed with PTSD in 2019. In contrast, the psychological examiner's April 2021 evaluation stated that C.O. "does not appear to fit the criteria for diagnosis of . . . PTSD[] at this time."

In the transfer order, the juvenile court found that the petition and notice requirements of Family Code Sections 53.04 through 53.07 had been satisfied; that there was probable cause to believe that C.O. had committed the capital-murder and aggravated-robbery offenses alleged in the State's petition; that the offenses were against the person of another (Marisa); that C.O. was of sufficient sophistication and maturity to be tried as an adult; and that the likelihood of reasonable rehabilitation of C.O. by the use of procedures, services, and facilities available to the juvenile court was low and contrary to the best interests of the public for the juvenile court to retain jurisdiction. *See* Tex. Fam. Code Ann. § 54.02(a), (b), (f)(1)–(2), (4). The juvenile court found that because of the alleged offenses' seriousness and C.O.'s background, the community's welfare required criminal proceedings. *See id.* § 54.02(a), (f)(3). The juvenile court stated that in making its determination, it had considered, among other things, the four statutory factors. *See id.* § 54.02(f)(1)–(4). The juvenile court stated that it based its findings on evidence presented by the State in support of its petition, as detailed in the contents of the prediagnostic study and evidence admitted through its witnesses, including the testimony of Huie and Detective Noble "regarding [C.O.'s] actions and conduct in the commission of the acts alleged in . . . [the State's p]etition, on the heinous nature of these actions and conduct, and the manner in which they were allegedly committed by [C.O.]."

In the order, the juvenile court noted that C.O.'s prior referrals to Tarrant County Juvenile Services included the offenses of evading arrest with a vehicle,

26

unauthorized use of a motor vehicle, two burglary-of-a-motor-vehicle offenses, violation of a court order, two credit-card-abuse offenses, and theft of property $2,500 to $30,000, for which he was adjudicated delinquent or placed in deferred prosecution programs.

## B. Analysis

Having reviewed all of the evidence, we conclude that it shows that the alleged offense was against a person (Marisa); that C.O. could appreciate the nature and effect of his actions and could assist in his defense; that C.O. had an increasingly dangerous criminal record; and that C.O.'s rehabilitation by using juvenile court procedures, services, and facilities was unlikely in light of unsuccessful previous efforts. *See id.* Accordingly, the juvenile court did not abuse its discretion by transferring C.O.'s case because the record shows that the juvenile court acted with reference to the applicable guiding rules and principles in reaching its decision. Assuming, without deciding, that the juvenile court erred during its initial remarks at the hearing, the record reflects that the juvenile court considered the four statutory factors and that sufficient evidence supports the juvenile court's transfer decision. Accordingly, we overrule C.O.'s second point.

## IV. Conclusion

Having overruled both of C.O.'s points, we affirm the trial court's judgment.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: December 16, 2021

27